IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ASHLEY ALFORD,                                    )
                                                  )
        Plaintiff-Intervenor,                     )
                                                  )
        v.                                        )        Case No. 3:08-cv-683 MJR-DGW
                                                  )
AARON RENTS, INC., *et al*.,                      )
                                                  )
        Defendants.                               )

SPECIAL MASTER'S REPORT AND RECOMMENDATION
PURSUANT TO THIS COURT'S ORDER

COMES NOW Special Master, Bill B. Dorothy, II, and for his Report and Recommendation

Pursuant to This Court's Order States:

**PROCEDURAL HISTORY[1]**

On September 30, 2008, the Equal Employment Opportunity Commission ("EEOC")

filed a Complaint against Aaron Rents, Inc. ("Aaron Rents"), and Ashley Alford ("Plaintiff" or

"Alford") filed a Motion to Intervene. On October 10, 2008, the Court granted Alford's Motion

to Intervene and Alford filed her Intervenor Complaint. Alford filed an Amended Complaint on

November 10, 2008.

On December 9, 2008, United States District Judge Michael J. Reagan set a final pretrial

conference for March 5, 2010, at 9:00 a.m. and a jury trial for March 22, 2010.  On January 15,

2009, Judge Wilkerson entered a scheduling order setting the close of discovery for October 5,

2009, and a dispositive motion deadline of November 20, 2009. Additionally, on January 15,

---

[1] This history, with minor contextual changes, is the Court's procedural history in its Order dated November 24, 2009. (Doc. 166.)

2009, this Court entered an Order Regarding Discovery (Doc. 24) informing the parties of the Court's procedure for resolving discovery disputes.[2]

Discovery disputes among the parties began surfacing almost immediately after the issuance of the scheduling order. On January 23, 2009, eight days after the entry of the scheduling order, the EEOC and Alford filed a Joint Motion to Quash Defendant Aaron Rents First Notice of Subpoenas for Production of Documents and Things to Non-Parties and a Joint Motion for Protective Order. (Doc. 32.) On January 29, 2009, the Court entered an order quashing the subpoenas and scheduling an in-person hearing for February 19, 2009, to address the protective order and the reissuance of subpoenas. Thirteen days before the scheduled hearing, without leave of court, Aaron Rents filed a six-page motion and a twenty-four-page memorandum of law requesting that the Court reconsider its "placeholder" order quashing the subpoenas.  Despite Aaron Rents' uninvited gratuitous February 6 submissions, after the February 19 hearing, where briefs were requested, it then resubmitted the prior briefs. (Docs. 50 and 51.)

Another discovery dispute arose on May 23, 2009.  Alford filed a Motion to Quash the Depositions of Ashley Alford and Belynda Woods. (Doc. 53.) On that same day, Aaron Rents filed a response to that motion. (Doc. 54.) On May 26, 2009, based on representations to the Court by Aaron Rents that the dispute had been resolved, the Court denied the Motion to Quash. (Doc. 55.) On May 29, 2009, EEOC and Alford filed a Joint Motion to Compel (Doc. 56), which the Court struck for failure to follow the procedures set forth in the Order Regarding Discovery. (Doc. 24.) The Court set a telephonic discovery dispute conference for June 8, 2009. At that conference, the Court ordered Aaron Rents to produce any and all documents regarding

---

[2] The Order directs the party raising the discovery dispute to contact the Court to schedule a telephonic discovery dispute conference at which the Court will hear the dispute informally before directing the parties to file motions. The Order also directs the parties to this Court's webpage on the Court's website for additional information.

complaints against Defendant Richard Moore and Brad Martin during their tenure at Aaron Rents. (Doc. 59.) The Court also scheduled an in-person scheduling conference for June 19, 2009, in the East St. Louis Courthouse to help the parties create a deposition schedule.[3] After that hearing the Court entered an Amended Scheduling and Discovery Order resolving other outstanding discovery disputes and setting a deposition schedule. (Doc. 61.)

On June 24, Aaron Rents filed, without leave of court, a Motion for Order to Issue Ruling permitting the reissuance of the previously-quashed subpoenas. (Doc. 62.) Judge Wilkerson scheduled a telephonic discovery dispute conference for June 26, 2009. (Doc. 65.) At that conference, he resolved eight outstanding disputes. (Doc. 67.) On July 13, 2009, Aaron Rents filed a motion asking the District Court to reconsider the discovery rulings made at the June 26 conference by Judge Wilkerson. (Doc. 68.) Alford filed a Response (Doc.71) and Memorandum in Opposition (Doc. 72) on July 23, 2009.[4]  Judge Michael J. Reagan denied the motion to reconsider on July 30, 2009. (Doc. 75.)

Throughout this "battle", the parties continued to raise additional discovery disputes. Judge Wilkerson scheduled an in-person discovery dispute conference for August 3, 2009, at the East St. Louis Courthouse, to be held prior to the depositions scheduled in the Courthouse on that day. (Doc. 70.) The August 3 conference was very contentious. He was not able to conclude the conference prior to the scheduled deposition, therefore the conference was continued. He also set a telephonic discovery dispute conference for August 5, 2009, to determine whether, in light of the many outstanding discovery disputes, the current deposition schedule could be maintained.

---

[3] The lawyers could not even agree as to when and where to take depositions.  The Court scheduled the depositions, even going so far as to have them conducted at the courthouse just to get the parties' attention that their conduct was "not the norm."

[4] Aaron Rents then filed a Reply to the Response to the Motion, ignoring both the Local Rules of the Southern District's strongly phrased admonition against reply briefs.

(Doc. 78.) At that conference, he determined that the schedule for depositions by the Court remain the same.

The Court then set an in-person discovery dispute for August 24, 2009, to determine two issues: (1) Defendant's use of privileged e-mail inadvertently disclosed by the EEOC; and (2) Plaintiff-Intervenor's request to talk to callers to Aaron Rents' sexual harassment hotline. Due to the time constraints created by the deposition scheduled in the Courthouse that day, the telephonic conference was cancelled and rescheduled for an in-person discovery dispute conference on September 15, 2009.

Prior to the September 15, 2009, hearing, Defendants filed multiple motions: Motion for Extension of Time to Complete the Deposition of Plaintiff-Intervenor Ashley Alford, for an Order Instructing Plaintiff-Intervenor's Counsel to Not Make Coaching Objections, and to Compel Responses to Prior Deposition Questioning (Doc. 84); Motion for Protective Order (Doc. 87); Motion for Protective Order Precluding Depositions of R. Charles Loudermilk, Sr. and Robert C. Loudermilk, Jr. (Doc. 89); Motion for Protective Order Precluding J. Bruce Launey's Deposition (Doc.91);[5] Motion for Extension of Time to Complete the Deposition of Belynda Woods and for an Order Requiring Plaintiff-Intervenor's Counsel to Cease Engaging in Tactics to Delay and Impede the Taking of Depositions in this Case (Doc. 95), and a Motion for Order to Admonish Plaintiff-Intervenor's Counsel to Allow All Deponents to Complete Their Answers Without Interruption, and Against Taking Photographs in Connection with a Judicial Proceeding by Aaron Rents, Inc. (Doc. 106). Alford responded to these motions. (Doc. 109.)

These motions, responses, replies and exhibits, cumulatively, easily comprise thousands of pages of text.

---

[5] Docs 87, 89, and 91 were granted at the hearing on September 15, 2009 and are no longer before the Court. (Doc. 93).

On September 11, 2009, the Court, in another attempt to bring to counsels' attention that their conduct was beyond the pale, ordered each attorney of record in this case to file with the Clerk of the Court an affidavit, sworn under penalty of perjury, that stated his or her current status with the District Court for the Southern District of Illinois, and a listing and statement of his or her current status with all other bars of which the respective attorney is a licensed member. The Court ordered these affidavits to be filed prior to the September 15 discovery dispute conference. To their credit, all attorneys complied. (Docs. 97, 98, 99, 100, 101, 102, 103, 104, 105 and 110.)

The in-person dispute conference was held on September 15, 2009 (the "Dispute Conference"). It was the Court's intention to clear all of the outstanding discovery issues in this case. Unfortunately, due to the argumentative tenor and tone of the motions and proceeding, and to the sheer number of disputes raised by the parties, the Court took most of the issues under advisement and granted EEOC and Alford additional time to file motions on the unargued disputes. The Court stayed additional discovery in the action until further order of the Court. (Doc. 114.)

A word about the depositions is in order. As noted above, because the parties could not agree on either time or place for some of the depositions in the case, the Court provided space in the East St. Louis Federal Courthouse for the parties to conduct the depositions of Plaintiff-Intervenor Ashley Alford, Belynda Woods, Damien Daniels, James Woods, Richard Moore, Brad Martin, Joe Skortz, and Harold Emde. (Doc. 61.) The depositions of Ashley Alford and Belynda Woods, Alford's mother, were particularly contentious. During both depositions, Judge Wilkerson was summoned multiple times to rule on objections raised during the depositions. At each appearance, the parties were reminded that they were to make their objections and then

allow the witnesses to answer. Speaking objections and multiple objections for relevance (which objection the Court had ruled was ongoing) would not be tolerated. Despite the Court's attempts to direct the parties to follow the rules in conducting the depositions, he had to take time out of his schedule, including during recesses in two jury trials held that summer, to resolve the repetitious, ongoing arguments of the parties. The deposition of Belynda Woods became so combative that Judge Wilkerson personally observed the deposition for approximately an hour in an effort to get the parties to conduct themselves professionally.

I.      The Law of Sanctions

     1.      Inherent Powers

"The power of a court over members of its bar is at least as great as its authority over litigants." Roadway Express, Inc. v. Piper, 447 U.S. 752, 756 (1980). Rules and statutes authorizing various sanctions do not limit the courts inherent powers as "[t]he rules do not state the limits of judicial power judges retain authority, long predating the Rules of Civil Procedure." Langley v. Union Electric Co., 107 F.3d 510, 514 n.4 (7th Cir. 1997) (citing Rose v. Franchetti, 979 F.2d 81, 86 (7th Cir. 1992). The Court's use of inherent power (and civil procedure rules) includes attorneys admitted *pro hac vice*. ILSD-LR 83.2; see also Vol. 30 Moore's Federal Practice, § 807.01[4] (Matthew Bender 3d ed.). Courts may ". . . withdraw *pro hac vice* admissions." Id. The reach of inherent power extends to the attorneys, the parties or both. See Piper, 447 U.S. at 766. The Seventh Circuit, at least *in dicta*, has stated that "bad faith" is not necessary when sanctioning an attorney." Vol. 30, Moore's Federal Practice § 807.01[6] (Matthew Bender 3d ed.) citing United States v. Claros, 17 F.3d 1041, 1047 (7th Cir. 1994).

"It seems quite clear that at least in the absence of contrary legislation, courts under their inherent powers have developed a wide range of tools to promote efficiency in their courtrooms

and to achieve justice in their results." <u>Eash v. Riggins True King, Inc.</u>, 757 F.2d 557, 564 (3d Cir. 1985).  Courts frequently invoke the power "to regulate the conduct of the members of the bar . . ." and "impose several species of sanctions on those who abuse the judicial process." <u>Id.</u> at 561.  Simply put, "[t]he dramatic rise in litigation . . . has led trial judges to conclude that indulgent toleration of lawyers' misconduct is simply a luxury the federal court system can no longer afford." <u>Id.</u> at 565.

> 2.      Rule 37, Fed. R. Civ. P.

Rules 37(b) states:

> (b) Failure to Comply with a Court Order.

>> (1) *Sanctions in the District Where the Deposition is Taken*.  If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court.

>> (2) *Sanctions in the District Where the Action is Pending*.

>>> (A) *For Not Obeying a Discovery Order*.  If a party or a party's officer, director, or managing agent –or a witness designated under Rule 30(b)(6) or 31(a)(4) – fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:

>>>> (i)  directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

>>>> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

>>>> (iii) Striking pleadings in whole or in part;

>>>> (iv) Staying further proceedings until the order is obeyed;

            (v) Dismissing the action or proceeding in whole or in part;

            (vi) Rendering a default judgment against the disobedient party; or

            (vii) Treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

    (B) *For Not Producing a Person for Examination*.  If a party fails to comply with an order under Rule 35(a) requiring it to produce another person for examination, the court may issue any of the orders listed in Rule 37(b)(2)(A)(i) – (vi), unless the disobedient party shows that it cannot produce the other person.

    (C) *Payment of Expenses*.  Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

FED. R. CIV. P. 37(b).

Rule 37 "provides a spectrum of sanctions."  <u>Cine Forty-Second Street Theatre Corp. v. Allied Artists Pictures Group</u>, 602 F.2d 1062, 1066 (2d Cir. 1979). The spectrum's principal purpose is a general deterrent to enforce a strict adherence to the "responsibilities counsel owe[s] to the Court and to their opponents."  <u>Nat'l Hockey League v. Metro. Hockey Club, Inc.</u>, 427 U.S. 639, 640 (1976). "[T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court." <u>Id</u>. at 643.  It is not necessary "merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." <u>Id</u>. at 643.  "[S]anctions recognize that a litigant's failure to abide court orders and rules, or his disregard of obligations inherent in the conduct of litigation, harm not only the system but the other participants in the process." <u>Anderson v. Beatrice Foods Co.</u>, 900 F.2d 388, 395 (1st Cir. 1990).

Rule 37(b)(2), Fed. R. Civ. P. lists specific categories of non-exclusive sanctions but "the court has broad discretion to impose any sanction or combination of sanctions it deems appropriate." STEVEN BAICKER-MCKEE, WILLIAM M. JANSSEN, AND JOHN B. CORR, FEDERAL CIVIL RULES HANDBOOK 2010 883 (2009). Indeed, the Court's limitation is that any order be "just." FED. R. CIV. P. 37(b)(2)(A). As long as the sanction is "just," the Federal Rules of Civil Procedure "place virtually no limits on judicial creativity." Anderson v. Beatrice Foods Co., 129 F.R.D. 394 (D. Mass. 1989), aff'd 900 F.2d 388, 394 (1st Cir. 1990)

## ATTORNEY SANCTIONS

### BACKGROUND FACTS

Plaintiff was deposed on July 16 ("Alford I") and August 12, 2009 ("Alford II"). The Court ordered Alford I to begin at 8:30 a.m. The animus of Judy Cates ("Ms. Cates" or Plaintiff-Intervenor's Counsel") and Alisa Cleek ("Ms. Cleek" or "Defendant's Counsel"), set forth below, is the attorney's norm. It is by no means isolated as the record is replete with such exchanges. Attempts to determine which of the two instigated the various quarrels is impossible.

This particular "quarrel" began with Ms. Cates "want[ing] to make a record before we go on tape." (Alford I, P. 6, L. 1-2.) Her record related to a proposed protective order. (Id. at P.6, L. 3-25; P. 7, 1-16.) Ms. Cates refused to agree, after citing appropriate objections. (Id. at P.7, L. 15-16.) This was the only civil exchange before the deposition began.

In the intervening six and a half (6 ½) pages: (1) Ms. Cates accused Ms. Cleek of transmitting a retaliatory email the night before; (2) Ms. Cleek countered with a list of outstanding discovery requests (arising as a result of the alleged e-mail retaliation) as a rejoinder to Ms. Cates' protective order soliloquy; (3) Ms. Cleek's plea for, sort of, beginning the deposition started to take hold; (4) Ms. Cleek then reversed course seemingly compelled to note

Ms. Cates' retaliatory email accusation was "just unprofessional"; and (5) Ms. Cates dove into the discovery disputes issues again.  And, if this was not enough, the two then went from extremely contentious behavior to the absolutely ridiculous.

Ms. Cates, Ms. Cleek and Ms. Shelly of the EEOC all announced their arrival times. They did so to establish who could be held responsible for the late start.  Ms. Cates accused Ms. Cleek of leaving the conference room to get a Coke, and then ended with "[s]o I don't want to be blamed in any way for delaying this deposition.  Okay?  We are now ready to go … and as far as I'm concerned, my client is ready."  (Id. at P. 12, L. 2-10.)  Ms. Cleek, taking the bait, denied the Coke accusation.  Seemingly not content to let Ms. Cates get the last salvo, Ms. Cleek ended with "[s]o do not dare try to put something that is an inaccurate statement on this record, that I was not in this room at 8:30."  The bathroom argument then began.

Ms. Cleek stated she had been in the restroom with Plaintiff and Ms. Cates. This spawned the following exchange:

| | |
|---|---|
| Ms. Cates: | I wasn't in the restroom.  I haven't gone to the restroom.  You're absolutely wrong. |
| Ms. Cleek: | Don't make allegations that I went and got a Coke, because I didn't. |
| Ms. Cates: | I haven't gone to the restroom.  What are you talking about? |
| Ms. Cleek: | Let's move on, but don't act like you were here and ready to go at 8:30, because your team was not ready to go. |
| Ms. Cates: | You're telling me I was in the restroom with my client?  I didn't even use the restroom. |
| Ms. Cleek: | Well, you're telling me I went to get a Coke, and I didn't. |
| Ms. Cates: | Well, I see it in front of you. |
| Ms. Cleek: | You see a Coke, and I didn't go get it, Ms. Cates. |

| Ms. Cates: | Let's go. |
|---|---|
| Ms. Cleek: | So, we're going to be here for a long time, and we can all assume it's going to continue to a second day, given the way we're starting out. |
| Ms. Cates: | Absolutely not. |
| Ms. Cleek: | You are certainly trying to extend this beyond the 4:30 time. |

Actually, the court reporter had been late.  The videographer had some trouble getting in to the Courthouse.  Ms. Shelly did leave the room, but did so for a laudable purpose; she went to get water for Plaintiff.  The deposition finally commenced 8:56 a.m.

Judge Wilkerson, on numerous occasions, issued mandates to counsel.  On January 15, 2009, the Court entered an Order Regarding Discovery Disputes.  *Order Regarding Discovery*, P. 1 (Doc. 24.)  It directed the party raising the discovery dispute to contact the Court to schedule a telephonic conference.  (Id.)  The Order expressly forbid filing motions or legal memoranda without a telephonic conference.  In direct contravention of this Order, Defendant's Counsel filed a six-page motion and a twenty-four-page memorandum of law.  Plaintiff-Intervenor's Counsel filed a Joint Motion to Compel without the requisite telephonic conference also.  (Doc. 56.)

Defendant's counsel, during one of many judicial deposition interventions, decided she was taking charge:

| The Reporter: | Are we on or off the record? |
|---|---|
| Ms. Cleek: | We are on the record. |
| Judge Wilkerson: | Just a minute.  Just a minute.  When I'm here, I'm in charge.  Okay? We're going to find out what the problem is, and then we'll go on the record.  All right.  Very good. |
| The Videographer: | Go off record. |

Judge Wilkerson:     Yes.

Repeated pleas for civility by Judge Wilkerson were ignored.  The "Coke" and "Bathroom" disputes. (Alford I, P. 11, L. 20-25; P. 12, 1-25; P.B.L. 1-25; P. 14, L. 1-20.)  The "objections to my objections" argument.  (Alford I, P. 126, L. 14-25; P. 127, L. 1-25.)  These examples are illustrative, not exhaustive.

The Court was forced to admonish experienced counsel regarding improper objections. Attempts were made to stop speaking objections and interposing relevance objections. By example, Judge Wilkerson chastised the attorneys, "We're all officer's of the court here.  – We know what are – What's objectionable and what's not."  (Alford I, P. 89, L. 1-3.)  Ms. Cates continued the use of speaking objections with a non-party witness.  (See e.g., Woods Dep., P. 22, L. 10-17.)  Ms. Cates began interjecting objections to leading questions.  She argued that a lack of foundation existed to treat a person as a hostile witness warranted leading question objections. The hostile witness was Alford's mother, who had shortly before testified she loved her daughter.

Beyond the attorney's patent lack of civility, the injury to the judicial functions also warrants sanctions.  Both attorneys, whether seeking fair or unfair advantage, strained the judiciary's resources.  The Court was required, on several occasions, to "baby-sit" experienced, competent counsel during depositions.  (Doc. 166, P. 7.)  It provided conference rooms.  (Id.)  It scheduled the depositions when the counsel's acrimonious behavior precluded them from doing so themselves.  (Id.)  The court, literally, read all or part of Rule 30, Fed. R. Civ. P. to the attorneys.  Hundreds, probably thousands, of attorneys each day manage to accomplish these tasks without judicial instructions. Unfortunately, those lawyers were not in East St. Louis.

Judge Wilkerson opined that his "appearance at the depositions did not significantly alter the unprofessional behavior at all."  (Doc. 166, P. 8.)

## ANALYSIS

"Every case involves the rights . . . of three parties:  the plaintiff, the defendant, and the court . . . ."  Higuera v. Pueblo Int'l, 585 F.2d 555, 556 (1st Cir. 1978).  Rule 37(b) permits the court to issue "such orders . . . as are just."  FED. R. CIV. P. 37(b).  Additionally, the Court's inherent powers are "vested in the courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."  G. Heileman Brewing Co. v. Joseph Oat Corp., 871 F.2d 648, 651 (7th Cir. 1989). "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates."  Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) (quoting Anderson v. Dunn, 6 Wheat. 204, 227, 5 L. Ed. 242 (1821)).

"[The court] takes its obligations to promote civility and collegiality between the bench and bar very seriously."  United States Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd., 540 F. Supp. 2d 994, 996 (N.D. Ill. 2008).[6]  "[The court] cannot turn a blind eye to conduct that negatively impacts its ability to promote the orderly administration of justice and resolve disputes fairly."  Id.  "[T]he trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; 'the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct.'"  United States v. Young, 470 U.S. 1, 10 (1985) (quoting Quercia v. United States, 289 U.S. 466, 469 (1933)).

---

[6] The Seventh Circuit Standards for Professional Conduct establishes duties towards other counsel:
  "20.  We will not engage in any conduct during a deposition that would not be appropriate in the presence of a judge.
   21.  We will not obstruct questioning during a deposition or object to deposition questions unless necessary under the applicable rules to preserve an objection or privilege for resolution by the court."

The court has promulgated, using its inherent powers and responsibility to supervise attorney's conduct, a full range of sanctions. ILSD-LR 83.2.  It is undisputed that a court may "specifically order [ ] the monetary sanctions payable to the Court instead of the opposing parties."  Anderson, 900 F.2d at 395.  Unless restrained, courts would spend "endless hours and resources serving as a referee for multiple discovery problems."  Jaen v. Coca-Cola Co., 157 F.R.D. 146, 151 (D. P.R. 1994).  The imposition of a modest monetary sanction on counsel is obviously considerably less severe than outright dismissal of the action.  Eash, 757 F.2d at 567.  Moreover, it "is perhaps more appropriate in that the penalty is directed at the lawyer responsible for the infraction, rather than the litigant who might be completely innocent."  Id.  "In essence, the attorneys have to answer for their actions." Jaen, 157 F.R.D. at 151.

At least two bases exist for attorney sanctions. First, despite successive and continual calls by the Court for counsel to heed questioning techniques, stop correspondence laced with accusations and the like, the "band played on." Second the general incivility—ignoring rules of professional conduct, wasting judicial resources and creating a hostile atmosphere warrants sanctions.

Many rulings regarding deposition conduct were rendered useless by the attorneys. They failed to heed warnings of uncivil conduct by a member of the federal judiciary. They spoke over one another and the Judge. Interruptions were frequent inappropriate behavior. The attorney's were required to adhere to the Illinois Rules of Professional Conduct[7]:

> Rule 3.2  Expediting Litigation
> A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

> Rule 3.3  Conduct Before a Tribunal
> (a)  In appearing in a professional capacity before a tribunal, a lawyer shall not:

---

[7] Illinois enacted new ethics rules effective on January 1, 2010.  The conduct of the lawyers in this matter occurred in 2008 and 2009.  Accordingly, the ethics rules for those years are utilized in this analysis.

14

> . . . (11) refuse to accede to reasonable requests of opposing counsel that do
> not prejudice the rights of the client

Rule 8.4  Misconduct
    (a)  A lawyer shall not:
        . . . (5)   engage in conduct that is prejudicial to the administration of justice

An atmosphere of general incivility, in a forum where persons come for peaceful resolutions of dispute, is not only counter-productive but calls into question the Court's validity. The rules of professional conduct were ignored. Judge Wilkerson expressly found that "[t]his Court has spent an inordinate amount of time and resources marshalling seasoned attorney's through the discovery practice." (Doc.166.) He explained that discovery "is not designed to handle non-compliance or unreasonable application." (Id.) "This case contains both." (Id.) These facts, coupled with Rule 3.2, 3.3 and 8.4, along with the attorney's conduct, establish a second basis for sanctions.

Finally, "[c]ivility is simply an integral component of the contentious legal process." Judge Bruce S. Meucher, *Civility:  A Casualty of Modern Litigation*, The Washington Lawyer, Sept.-Oct. 1993, at 19.  The attorney's complete lack of civility is disgraceful. Not just the spoken word or hostile environment—even the last pleadings filed by both sides were belligerent. Steeped in invective, one attorney writes with bold and sometimes two exclamation marks invoking cries of "lying" and "mischaracterization." This last claim, and the facts supporting it, demean and hinder the practice of law.

Both counsel, Ms. Cleek and Ms. Cates, fall within the Court's ability to sanction.  Each have violated the Court's rules regarding discovery practice. Each have, in my opinion as Special Master, violated some portions of the Illinois Rules of Professional Conduct. Each have, literally,

abandoned civility. In essence, the attorneys have to answer to the court for their actions. <u>Jaen</u>, 157 F.R.D. at 151.[8]

## <u>RECOMMENDATIONS</u>

1.  Defendants' Counsel, Alisa Cleek, shall personally pay a sanction to the Court of three thousand seven hundred-fifty dollars ($3,750.00)

2.  Plaintiff-Intervenor's Counsel, Judy Cates, shall personally pay a sanction to the Court of three thousand seven hundred-fifty dollars ($3,750.00).[9]

3.  This sanction will be distributed pursuant to the Court's instructions to assist <u>in forma</u> <u>pauperis</u> filings or the like.

---

[8] The fact that the attorneys involved, by reputation at least, are usually attorneys who conduct themselves in a professional and civil manner does not change the reality of what happened in this action.
[9] This figure is based upon an article dealing with costs of ordinary litigation.  Distilled, the average federal court case cost was, at the time the article was written, fifteen thousand dollars ($15,000.00).  Of that sum, basically fifty percent (50%) was expended upon discovery.  Thus, the sanction halves the total cost and divides by two to reach the sanction amount.  Obviously, the information is dated but calculating inflation into this formula would yield a potentially astronomical number. Even though, newer studies place the costs substantially higher.  Marc Galanter, *Reading The Landscape of Disputes:  What We Know and Don't Know (AND THINK WE KNOW) About Our Allegedly Contentious And Litigious Society*, 31 UCLA L. REV. 4, 80, 89 (1984).

I.     Defendant Aaron Rents, Inc.'s Motion for Time to Complete the Deposition of Plaintiff-Intervenor Ashley Alford, for an Order Instructing Plaintiff-Intervenor's Counsel to not Make Coaching Objections and to Compel Responses to Prior Deposition Questioning **(Document 84)**

II.    Defendant Aaron Rents, Inc. and Brad Martin's Motion For Time to Complete the Deposition of Belynda Woods and for an Order Requiring Plaintiff-Intervenor's Counsel To Cease Engaging in Tactics to Delay and Impede the Taking of Depositions in this Case **(Document 95)**

III.   Defendant Aaron Rents, Inc.'s Motion for Order to Admonish Plaintiff-Intervenor's Counsel to Allow All Deponents to Complete Their Answers Without Interruption, and Against Taking Photographs in Connection with a Judicial Proceeding. (**Document 106**)

## <u>BACKGROUND</u>

Defendants' Motions, Documents 84, 95, and 106, seek to re-open the depositions of Plaintiff and her mother, Belynda Woods.  Additionally, Defendant seeks relief from Ms. Cates "coaching objections," "tactics to delay," impeding the depositions, interruption of deponents' testimony, and to compel responses to prior deposition questioning.

The quantifiable facts surrounding the factors justifying re-opening the brief  are relatively simple. Depending on whether you ask Plaintiff-Intervenor's Counsel or Defendant's Counsel, some three thousand to ten thousand documents have been produced pursuant to rule 34. (Doc. 108, P. 7; or Doc. 85, P. 13.)  Additionally, several claims by Defendants regarding a failure to provide medical history, employment and tax records exist. (Doc. 117, P.94, L. 9-23; P. 100, L. 15-25.)   Moreover, Judge Wilkerson expressed concern over the EEOC's involvement. His concern focused on, among other things, having too many parties at the deposition table.[10] Finally, one nearly dispositive factor, the acts of Plaintiff-Intervenor's Counsel at Alford I, Alford II and Belynda Woods deposition, will be addressed.

---

[10] The EEOC's severance has now occurred.

It is apparent that Ms. Cleek had a longstanding "bone to pick" with Ms. Cates deposition tactics.  Ms. Cates record confirms that the feeling is mutual.[11]

In Alford I, after the preliminary questioning of Plaintiff, Ms. Cleek stated "And I'm going to ask you, Ms. Cates, again, not to coach the witness when I'm asking the witness a question . . . I'm asking her [Plaintiff]." (Id. at P.20, L. 14-17.)  Ms. Cleek's request lasted for two pages of transcript:

| | |
|---|---|
| Q: (by Ms. Cleek) | Now, you voluntarily dismissed . . . [a state claim] . . . against Mr. Moore in order to bring him into the current case that we're here for today; is that correct? |
| Ms. Shelly: | I'm going to object.  Calls for a legal conclusion. |
| Ms. Cates: | Join.  Do you understand what she's asking you? |
| The witness: | Kind of. |
| Ms. Cates: | If you don't understand, tell her you don't understand. |
| The witness: | I don't understand. |

(Alford I., P.22, L. 22-25; P. 23, L. 1-8.)

Ms. Cleek, again, stated: "I'm going to ask that you keep your objections simply to form. Stating to the witness, you can answer if you understand, is coaching her to state that she does not understand something."  (Id. at P.23, L. 9-13.)  Two lines later, after repeating the question, Ms. Cates stated: "Objection, call for a legal conclusion.  I assume she knows what her lawyers were thinking."  (Id. at 23, L. 23-25.)  Ms. Cleek asked for Plaintiff's answer.

Ms. Cates interjected, "If you know."

---

[11] In fairness to Ms. Cates, Defendants' many counsel used coaching objections.  Nowhere in the record does she seek relief.  She employs, literally, a "what's good for the goose is good for the gander" argument.  See Novelty, Inc. v. Mountain View Mktg., 265 F.R.D. 370, 380 (S.D. Ind. 2009) (rejecting platiniffs arguments that because defendants failed to comply with Rule 26 (b)(5)(A) that their privilege log is acceptable). Judge Wilkerson denied it based upon counsel's lack of standing having failed to seek relief. and so does the Special Master. (Doc. 117, P. 66, L. 18-25.)

Plaintiff's answer: "I don't know."

Later, during the same deposition, Ms. Cates went beyond suggestion at one point:

| | |
|---|---|
| Q: (by Ms. Cleek) | Have you ever had your license revoked? |
| A: | It was taken until I went to court when I got the tickets for uninsured and not registering it. |
| Ms. Cates: | Just answer her question.  Revoked. |
| Ms. Cleek: | And, again, I'm going to object to the coaching of the witness during the deposition I'm taking.  Ms. Cates, I'd like you to keep your objection to the response . . . |
| Ms. Cates: | You're wasting a lot of time trying to instruct me. |
| Ms. Cleek: | And that's not the answer that is appropriate, but please do not coach the witness. |
| Ms. Cates: | I want to make sure my client gives an honest and truthful answer, and she's not responding appropriately.  My objection is its not responsive to the question.  She needs to answer the question. |

(Id. at P. 28, L. 17-25; P. 29, L. 1-11.)

Another time, Ms. Cates instructed her client not to answer a non-privileged arrest inquiry stating: "[d]o not answer the question." (Id. at P. 25, L. 12-25.)  Ms. Cleek asked if she was instructing the witness to not answer.  (Id.)  Ms. Cates then instructed the witness: "I am.  Do not answer that question."(Id.)  Ms. Cleek then asked whether Plaintiff-Intervenor's Counsel knew it was not a proper instruction under the federal rules.  (Id.)  Bantering back and forth, Ms. Cates finally admitted she had a copy of the rules with her.  (Id.)

Varying estimates exist, but at least six (6) speaking objections were interjected prior to Judge Wilkerson's first deposition intervention.  At least six (6) objections as to the relevance of Cleek's questioning were interposed.  As to speaking objections, a continuing issue, the Court stated "Here's the deal: We're all officers of the Court here.  We know what's objectionable and

what's not." (Alford I, P. 89, L. 1-3.)  A continuing objection as to relevance, unnecessary, except to placate counsel, was interposed. (<u>Id.</u> at P.89, L. 8-11.)

Ms. Cleek's deposition exhibit #2, identical except as to Bates stamped counter-parts, was used with a witness.[12]  Judge Wilkerson specifically directed Ms. Cleek "to the extent that you can use Bates stamp document, please use them."  Nearing a break, Ms. Cates interpretation of the Judge's request became "I would ask that during the break, you get the Bates numbers the Judge has *required*." (<u>Id.</u> at P. 113, L. 22-23 (emphasis added).)  The disparity between the Judge's request and Ms. Cates' interpretation yielded another page and one half argument.

Plaintiff-Intervenor's Counsel used language seemingly calculated to engender animus. Her record is replete with pejorative and invective:

"This is one of the difficulties not having an Illinois lawyer."  (Alford I., P. 29, L. 13-14.)

* * *

| | |
|---|---|
| "Ms. Cleek: | I have told counsel that at 11:30, I needed to take about twenty minutes for a personal issue.  Counsel has now demanded that I inform them as to what that personal issue is. |
| Ms. Cates: | That is not true.  It is not true. |
| Ms. Cleek: | So I am going to now—Please let me finish my statement and then you can response, Ms. Cates. |
| Ms. Cates: | You're about to lie.  You're going to lie under oath, or on the record. |
| Ms. Cleek: | Ms. Cates I'm not under oath. |
| Ms. Cates: | On the record, you're not going to lie. |
| Ms. Cleek: | So, just wait a minute, and then you can respond however you feel appropriate. |

---

[12] Nothing in the record at the time the missing numbering was initially addressed showed any discrepancy between the two documents beyond the Bates stamp numbers.  Subsequently, various employment applications were adduced. At the prior point and during Judge Wilkerson's intervention, Bates stamps were the issue.

| | |
|---|---|
| Ms. Cates: | But you're lying. |
| Ms. Cleek: | -- instead of interrupting me. |
| Ms. Cates: | I'm not going to let you lie on the record.[13] |

(Alford I, P. 118, L. 12-25; P. 119, L. 1-7.)

* * *

| | |
|---|---|
| Ms. Cates: | "That's bull!  That is just an out and out lie." |

Alford II included another speaking objection by Ms. Cates and another request by Ms. Cleek to cease the practice.  (Alford II, P. 16, L. 4-25; P. 17, L. 1-2.)  By silence, Ms. Cates encouraged Plaintiff to not answer premised upon an "asked and answered" objection:

| | |
|---|---|
| Ms. Cleek: | Correct, but the Judge ruled at the last deposition that the witnesses had to answer.  So you are still instructing her not to answer? |
| Ms. Cates: | I'm still directing you.  You already had the information from Belynda Woods now. |
| Ms. Cleek: | Well, if she's already answered, then she can go ahead and answer again. |
| Ms. Cates: | It's asked and answered.  This is my point.  You want more time, and I'm going to create a record of how you continue to ask and answer the same questions. |
| Ms. Cleek; | I apologize.  I don't recall your answer. |
| Q (By Ms. Cleek): | Why were you suspended? |
| A. | I'm not going to answer the question.  I'm sorry. |
| Q (By Ms. Cleek): | Are you going to allow your witness not to answer because of asked and answered? |
| Ms. Cates: | I'm not going to respond. |
| Ms. Cleek: | Let's go off the record. |

---

[13] A page and a half argument then ensued over the length of the planned 11:30 break.  (Id. at P. 119, L. 8-25; P. 120, L. 1-24.)

The taking of Belynda Woods deposition, Plaintiff's mother and witness, was supervised for approximately one hour by Judge Wilkerson.  Ms. Cates' intervention:

Q (by Mr. Friedman): And how far was your workplace from Aaron's Fairview Height's store?

A.    I'm not sure.

Q.    And approximately is fine.

A.    I don't know.  Maybe eight miles.  I don't know.

Ms. Cates:  You're not required to guess under the rules.

A.    Thank you.

Ms. Cates:  If you have to guess, you should tell him you're guessing.

A.    And I am guessing.

(Woods Dep., P. 17, L. 16-25; P. 18, L. 1-2.)

Ms. Cates argued with Judge Wilkerson over the Defendant counsel's use of leading questions:

Ms. Cleek:  This is the Plaintiff's mother.

Ms. Cates:  It doesn't matter.  I mean she's a witness and she's not adverse. We should be allowed our time.

Judge Wilkerson: At -- at this issue, here's the deal.  At this time, you know, we're not going to argue whether the plaintiff's mother is with the Plaintiff.

Ms. Cates:  That cannot -- your Honor, that –

Judge Wilkerson: Just a minute.  Uh-uh, I'm not going there.  This -- I sat in this deposition and heard this lady say she loves her daughter.  Okay, so now to tell me that after that testimony if she loves he daughter that she's not adverse to the people that her daughter are suing, that just ain't flying.

Ms. Cates:  That -- that's not the law, your Honor.

Judge Wilkerson:      Okay, well –

Ms. Cates:            They have a burden that they have to show.

Judge Wilkerson:      All right, what more do you want than I love the plaintiff?

The predicates for marking a witness "hostile" do have to be examined. Yet it seems highly

unlikely, as Ms. Cates is most certainly aware, that any judge would not accede to the obvious.

At Alford I, Ms. Cates attempted to have the videographer use a videorecroder and "take

one swing and show the circumstances of the deposition." (Doc. 117, L. 13-18.) Ms. Cleek

objected. (Id.) Plaintiff-Intervenor's Counsel then took out a camera and made a picture. The

Court ruled the photograph was not to be used. (Doc. 117, P. 79, L. 2-13.)

Plaintiff-Intervenor's Counsel, on the record, stated her responses to Documents 95 and

106 would be "a brief evidentiary kind of submission." (Doc. 117, P. 73.) What followed, in the

response to Document 106, was a twenty page response. The only truly responsive portion of the

pleading appeared on the second page, devoid of legal authority, stating "Alford's counsel has

not engaged in any inappropriate conduct." (Doc. 123, P. 2.) What followed then were eighteen

(18) pages of, by Plaintiff-Intervenor's Counsel's own admission, a "people who live in glass

houses should not throw stones" argument. (Id. at P. 3.) This is a slight variation of her "what's

fair for the goose is fair for the gander" argument.

Adding injury to insult, she then appended eight hundred seventy-four (874) pages of

exhibits. All the exhibits were meant to elicit proof of prior wrongs by the opposing party's

attorneys.

Defendants' Counsel's motion, too, was a slight variant of two prior motions in

Documents 84 and 95. The thrust of the three motions is the allegation that Plaintiff-Intervenor's

23

Counsel disrupts and delays depositions. Document 106's complaints are directly related to Defendant's prior motions. (Docs. 84 and 85.)

## ANALYSIS

A variety of reasons for briefly extending Plaintiff's and Woods' depositions exist.  See STEVEN BAICKER-MCKEE, WILLIAM M. JANSSEN, & JOHN B. CORR, FEDERAL CIVIL RULES HANDBOOK 2010 785-806 (2009).  Specifically "numerous and/or lengthy documents" or "instances where document were requested but not produced prior to the deposition" are acceptable grounds. Id.

Both parties have ventured estimates as to the number of documents involved in this matter, decreasing or increasing the estimate as suits their needs.  Listed under Plaintiff-Intervenor's Counsel's Response to Defendant's Motion "Mischaracterization 7: Over 10,000 pages of documents have been produced in this case," Alford's number seemingly yields a number around three thousand pages.  (Doc. 108, P. 7.)  On the other end of the spectrum, Defendant's alleged total seems to remain around ten thousand pages.  (Doc. 96, P. 11.)  In prior times, responses by Defendants, including the EEOC documents, the number hovers around eleven thousand-four hundred pages.  (Doc. 85, P. 13.)  Either estimate warrants some increase in deposition testimony time. Both parties, in many ways and many times, have asserted claims of failure to produce documents. Defendants have specifically identified medical providers and records, health insurers, and tax documents not yet produced.  Plaintiff's counsel has acknowledged these deficiencies and was actively seeking the records, to her credit.  Thus, another factor exists warranting briefly re-opening the depositions.  Additionally, after the depositions, prior to the eventual EEOC severance, the Court expressed concern over the level of

difficulty spawned by the multiple parties.  This too is another factor weighing in favor of re-opening the depositions.  Alone or together, on these bases, the depositions should be re-opened.

The deposition limitation of one day of seven hours must be modified by the court "if the deponent, another person, or any other circumstances impedes or delays the examination."  FED. R. CIV. P. 30(d)(1).  The Rule's commentary lists "[e]xamples of situations in which an extended deposition would be warranted includ[ing]:  depositions in which improper objections or other conduct by other attorneys or the witness has impeded the examination."  STEVEN BAICKER-MCKEE, WILLIAM M. JANSSEN, AND JOHN B. CORR, FEDERAL CIVIL RULES HANDBOOK 2010 782-83 (2009).  "Objections must be stated in a non-suggestive manner."  STEVEN BAICKER-MCKEE, WILLIAM M. JANSSEN, AND JOHN B. CORR, FEDERAL CIVIL RULES HANDBOOK 2010 782 (2009).  Objections should not be used "to instruct the witness how to answer (or not answer a question)."  Id.  Parties "do not need to raise objections such as relevancy or competency that cannot be cured.  Id.  Successive amendments to "Rules 30(c) and (d) state that they were 'aimed at reducing the number of interruptions during depositions'" United States v. Kattar, 191 F.R.D 33, 38 (D. N.H. 1999).  Depositions determine "what the witness saw, heard, knew or thought 'through a question and answer conversation between the deposing lawyer and the witness.'" Id. "Frequent and suggestive objections' can completely frustrate that objective." Id.

Ms. Cates made a variety of "speaking objections" that suggested, or at least were interpreted by her client to be, instructions on how to answer a question.  Deposing a party or a witness, under even perfect circumstances, is challenging.  Ms. Cates' Bates stamp issue, eliciting a page and one half of argument, wittingly or unwittingly, misrepresented the Judge's instructions to Ms. Cleek.  The record includes repeated pejorative comments by Ms. Cates: "You're about to lie," "That's bull, that is just an out and out lie."  Twice, in one colloquy, she

threatened to report Defendants counsel to the Attorney Registration and Disciplinary Committee if ex parte communications were found.[14]

## RECOMMENDATIONS

1.    Plaintiff's deposition, after production of medical history, health insurance providers, employment history and salary from employers, and tax records, should be extended by two hours.

2.    The Belynda Woods' deposition should be extended by one hour.

3.    The parties' counsel should be forewarned that any witness coaching, speaking objections, uncivil behavior, interruptions of witness, or efforts to delay either deposition will result in sanctions.

---

[14] The surprise appearance of Judge Wilkerson, angry, seemingly acting off his chamber clerk's description of the deposition, was allegedly induced by Richard Escoffery conversations.  Accusations and characterizing opposing counsel as "liars" has no place in a judicial proceeding.  *See* Standards for Professional Conduct Within the Seventh Federal Judicial Circuit, Lawyer's Duties to Other Counsel, No. 2 ("We will abstain from disparaging personal remarks or acrimony toward other counsel"); No. 4 ("We will not, absent good cause, attribute bad motives or improper conduct to other counsel . . .").

I.      Plaintiff-Intervenor's Counsel FERPA Privilege
        (**Document 84**)

## BACKGROUND

Cates raises the Family Education Rights and Privacy Act ("FERPA") as a challenge to

Defendant's question regarding Plaintiff's disciplinary problems at her former school. [15] "So

there was a federal law, the acronym is FERPA . . . which prohibits disclosure of student

information." 9/15/2009 Discovery Dispute Conference P. 68, L. 16-18, Sept. 15, 2009. "FERPA

doesn't only apply to records, it applies to the information." Id. at P. 69, L. 3-4. "What their[sic]

objecting to is one question and that is disciplinary problems." Id. at P. 69, L.19-20.

## ANALYSIS

The relevant provision of FERPA reads:
>       No funds shall be made available under any applicable program to any
>       educational agency or institution which has a policy or practice of permitting
>       the release of education records . . .

20 U.S.C. §1232g(b)(1) (2009) ("FERPA"). One of the purposes for creating the statute was the

concern over "the insertion of potentially prejudicial anecdotal comments and factual

inaccuracies into children's school records." 121 CONG. REC. 13990 (1975). "There has been

clear evidence of frequent, even systematic violations of the privacy of students and parents by

the *schools* through the unauthorized collection of sensitive personal information and the

---

[15] Plaintiff's argument that the Illinois School Student Records Act may also give rise to a privilege is illusory, because Alford's disciplinary records from Wiesbaden High School are not within the state of Illinois nor were they created in Illinois. Alford's records at Wiesbaden High School would be stored in either Germany or Minnesota. Department of Defense Education Activity-Student Records and Transcript Request Procedures, http://www.dodea.edu/students/transcripts.cfm.

unauthorized, inappropriate release of personal data to various individuals and organizations."
121 CONG. REC. 13991 (1975) (emphasis added). "[FERPA's non disclosure provisions] have an
'aggregate' focus, . . . they are not concerned with 'whether the needs of any particular person
have been satisfied.'" Gonzaga Univ. v. Doe, 536 U.S. 273, 288 (2002) (quoting Blessing v.
Freestone, 520 U.S. 329, 343 (1997)). "In each [of FERPA's] provisions the reference to
individual consent is in the context of describing the type of "policy or practice" that triggers a
*funding prohibition*." Id. (emphasis added).  "FERPA's nondisclosure provisions further speak
only in terms of institutional policy and practice, not individual instances of disclosure." Id.

Based upon the congressional history and the Supreme Court's statement in *Gonzaga*,
FERPA's purpose is clear to protect students and parents from a *school's* unauthorized release of
a student's record. Defendants are deposing Woods and Alford, not Wiesbaden High School. The
interrogation directed to Woods and Alford does not ask specifically what Alford's school record
includes. Rather, it asks them personally without reference to any document about disciplinary
problems premised upon their personal recollection of any disciplinary problems. The potentially
prejudicial records, if any, that Wiesbaden High School may or may not have are immaterial in
the inquiry.

## **RECOMMENDATION**

1.     Defendant's interrogation of Woods and Alford about disciplinary problems
        simply does not require the invasion of FERPA privileged material. The
        underlying facts are permissible under FERPA.

I.      Plaintiffs' Motion to Require Defendants Aaron Rents, Inc and Brad Martin to Provide a
        Privilege Log that Satisfies Rule 26.
        (**Document 130**)

## BACKGROUND

The Court ordered[16] all parties to produce a privilege log on June 22, 2009. Aaron

Rents[17] produced two privilege logs after this date. The first privilege log listed, at best, eight

vague descriptions of privileged material. The second supplemental privilege log, filed almost

three months later, added one privileged material. Defendants listed their privileged items

attempting to have a catch-all or "blanket" coverage for privileged materials. For example, one

of the "privileged documents" in Defendant's Supplemental Privilege Log reads:

> Correspondence **FROM** Aaron Rents, Inc., including any of its agents,
> managers, officers, and/or directors **TO** Elarbee, Thompson, Sapp &
> Wilson, LLP, including any of its attorneys, legal assistants, and/or
> employees. This correspondence was intended to be held in confidence by
> senders and receivers for use in rendering legal advice and/or anticipation
> and/or preparation for litigation and not for communication to third parties.

For this document, Defendants list "Various" under the "Date" heading, and assert

"Attorney/Client Privileged <line break> Attorney Work Product" under the "Privilege

Asserted" heading. Thus, the complete formatted privilege log for this document appears as:

| | Date | Document | Privilege Asserted |
|---|---|---|---|
| | | | |

---

[16] (Doc. 61.)
[17] Plaintiffs' Motion is to require both Aaron Rents and Martin to provide a privilege log that satisfies Rule 26. Only
Aaron Rents appears as a defendant in the first privilege log. Both Aaron Rents and Martin appear as Defendants in
the Second Supplemental Privilege Log.

| 1. | Various | Correspondence **FROM** Aaron Rents, Inc., including any of its agents, managers, officers, and/or directors **TO** Elarbee, Thompson, Sapp & Wilson, LLP, including any of its attorneys, legal assistants, and/or employees. This correspondence was intended to be held in confidence by senders and receivers for use in rendering legal advice and/or anticipation and/or preparation for litigation and not for communication to third parties. | Attorney/Client Privileged Attorney Work Product |

This broad all-inclusive purported document, like the rest of Defendant's "privileged documents," are insufficient to satisfy Rule 26(b)(5)(A), Fed. R. Civ. P.

## ANALYSIS

"An attorney asserting privilege must timely support that claim with a "privilege log" which describes the nature of each document being withheld." Hobley v. Burge, 433 F.3d 946, 947 (7th Cir. 2006). "An assertion of privilege therefore must be made on a document-by-document basis." In re Grand Jury Proceedings, 220 F.3d 568, 572 (7th Cir. 2000). "A party who invokes any privilege [] must . . .  provide to the opposing party a privilege log containing the following information for each document not disclosed: (1) the name and job title or capacity of the author(s)/originator(s); (2) the names of all person(s) who received the document or a copy of it and their affiliation (if any) with the producing party; (3) a general description of the document by type ( *e.g.,* letter, memorandum, report); (4) the date of the document; and (5) a general description of the subject matter of the document." In re Bridgestone/Firestone, Inc., ATX, ATX II, 129 F. Supp. 2d 1207, 1218-19 (S.D. Ind. 2001).

The inclusion of this information in privilege logs is necessary because "without the identities and job descriptions of the persons on the distribution lists, there is no way for an opposing party to assess whether they are within the sphere of corporate privilege, as is required by Federal Rule of Civil Procedure 26(b)(5)(A)." Muro v. Target Corp., 250 F.R.D. 350, 364

(N.D. Ill. 2007). Less than a month after this motion was filed, the District Court for the Southern District of Indiana held a privilege log which listed documents such as "[e]mails exchanged between [plaintiffs] and Overhauser Law Offices April 20, 2007-present" and "[d]ocument prepared by counsel for [plaintiffs] regarding [defendants]" claiming to be privileged by "work product and/or . . . attorney-client privilege" were "devoid of the factual basis necessary to properly establish entitlement to some evidentiary privilege." <u>Novelty, Inc. v. Mountain View Mktg., Inc.</u>, 265 F.R.D. 370, 380 (S.D. Ind. 2009).  Defendants' privilege logs most nearly mirror that of the deficient <u>Novelty, Inc.</u> log, rendering it unacceptable.

Defendants contend that Plaintiffs have fashioned their privilege logs in a near identical manner. However, Plaintiff's compliance with Rule 26(b)(5)(A) has not been raised as a motion and is not relevant to Defendants requirement to satisfy Rule 26(b)(5)(A). <u>See</u> <u>Novelty, Inc.</u>, 265 F.R.D. at 381 (rejecting plaintiffs argument that because defendants failed to comply with Rule 26(b)(5)(A) that their privilege log is acceptable). This tit-for-tat argument did not work for Plaintiff with regard to the speaking objections and will not work for Defendants here.

## **RECOMMENDATIONS**

1.    Defendants shall resubmit their privilege logs in accordance with the Seventh Circuit document-by-document standard.

2.    Defendant's privilege log must, at a bare minimum, consist of the following information: (1) the author(s)/originator(s) name and job title or capacity; (2) the names of all people who received the document or a copy of it and their affiliation with the party producing the document; (3) a general description of the document by its type; (4) the document's date; and (5) a general description of the document's subject matter.

31

3.      The document-by-document listing requires that each separate document be

isolated and include the required privilege log information.

I.      Plaintiffs' Motion to Compel Responses to Plaintiff-Intervenor's First and Second
Requests for Production of Documents to Richard Moore.
(**Document 136**)

## BACKGROUND

Plaintiff-Intervenor has sent two requests to Defendant Richard Moore ("Moore") for

production of documents.[18] Between the two, Moore faced thirteen total requests to produce

documents. Roosevelt, Moore's attorney, did not respond to the First Request. In his response to

the Second Request, Roosevelt claimed the First Production Request could not be located. The

Second Request asked for "[a]ny and all photographs and their negatives for pictures that were

either taken by Richard Moore or that are in the possession or control of Richard Moore for the

Bike Raffle held by Aaron's Rents in 2005 and 2006." (Pl.'s Second Req. for Produc., Aug. 20,

2009. ) Roosevelt objected to the Second Request because the terms "notes taken by Richard

Moore that relate to" was vague and ambiguous. Nowhere in the Second Request do those terms

appear. However, Plaintiff-Intervenor's First Request's first item asks for Moore to "[p]roduce

all *notes taken by Richard Moore that relate to* or were taken by Richard Moore during the

deposition of Ashley Alford on July 16, 2009. It seems difficult to believe that Roosevelt would

be unable to locate the First Request, but was able to respond to the Second Request quoting

language directly out of the First Request.

## ANALYSIS

---

[18] The first request was sent on July 21, 2009. The second request was sent on August 20, 2009.

Plaintiff-Intervenor moves this Court to require Defendant Moore to comply with discovery based on Federal Rule of Civil Procedure Rule 37. Rule 37(a)(1) reads:

> On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The Motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

FED. R. CIV. P. 37(a)(1).

"An evasive or incomplete . . . response must be treated as a failure to . . . respond." FED. R. CIV. P. 37(a)(4). Reasonable expenses incurred in the making of a Rule 37 motion will be awarded only after giving the party, who failed to comply with requests, an opportunity to be heard. FED. R. CIV. P. 37(a)(5)(A). Reasonable expenses will not be awarded if "the movant filed the motion before attempting in good faith to obtain the . . . discovery without court action;" or if "the opposing party's  . . . response[] or objection was substantially justified;" or if "other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(a)(5)(A)(i-iii).

Roosevelt provided an incomplete response to Plaintiff-Intervenor's Motions for Compliance with Rule 37. Roosevelt had eighteen days between when Plaintiff-Intervenor's filed this motion and when he filed his response to obtain or locate a copy of the first response request. He failed to do. While Roosevelt's conduct is seemingly disingenuous, it appears to be an isolated occurrence with respect to this litigation.

## **RECOMMENDATIONS**

1.  Defendant Moore's privilege log shall be reformatted to conform to the Document 130 recommendation for privilege logs.

2.  Absent Defendant Moore requesting privilege over the requests sought by Plaintiff-Intervenor, the requests shall be granted.

3.      Defendant Moore shall be ordered to furnish the requests within thirty days, unless this Court determines that special circumstances indicate a need for more time.

4.      Roosevelt shall be given an opportunity to be heard on why he failed to comply with Plaintiff-Intervenor's requests.

5.       If Roosevelt fails to satisfy any of the three Rule 37 exceptions, then the Court must require Roosevelt to pay Plaintiff-Intervenor's reasonable expenses sustained as a result of their making the motion.

I.      EEOC and Ashley Alford's Joint Motion to Compel Production of All Electronic Images
        From Security Cameras
        (**Document 129**)

## BACKGROUND

On October 12, 2006, Aaron Rents had four security cameras inside the store. (Moore

Dep. P. 62, L. 21; Adams Dep. P. 308, L. 4-15; Martin Dep. P. 125, L. 7-8[19].) Cameras 1 and 2

recorded the sales/showroom floor. (Moore Dep. P.61, L 8-10; Adams Dep. P. 303, L. 2.)

Camera 3 recorded the CAM office. (Moore Dep. P. 62, L. 1; Adams Dep. P. 308, L. 12-13.)

Camera 4 recorded the back door/loading dock area. (Moore Dep. P. 62, L. 19; Adams Dep. P.

308, L. 15.)

After arriving at Aaron Rents, Brad Martin contacted Vanessa Adams. (Martin Dep. P.

95, L. 3-4.) Adams told Martin to "*preserve everything*, don't let *anything* leave the store."

(Martin Dep. P. 97, L. 6-7(emphasis added).) O'Fallon Police Department Detective David

Matevey reported no video footage of evidentiary value was obtained[20]. (Def. Ex. 1 to Ex. E.)

Martin and Jeff Hicks made copies of the tapes from the time Alford and Moore arrived at the

store until the police came. (Martin Dep. P. 167, L. 24-25).[21] The copies were produced from the

digital version which was internalized in the camera. (Martin Dep. P. 124, L. 11-17.)

---

[19] Plaintiff and Plaintiff-Intervenor reference Brad Martin's deposition as to the existence of four cameras to Exhibit
I, pages 19, 20, and 125.  Pages 19 and 20 do not contain one single reference to cameras. Plaintiff and Plaintiff's
counsel failed to even include page 125. Fortunately, Defendants included the page in their Exhibit "C".
[20] Presumably this was a police investigation evidentiary standard as, obviously, Matevey's legal opinion is
irrelevant.
[21] Alford arrived at the store at 7:58 AM. (Pls' Ex. C.) Moore arrived at the store at 7:51 AM. (Id.) The police
arrived at the store at approximately 9:40 AM. (Id.) These reported times are inaccurate because Adams

Plaintiff and Plaintiff-Intervenor received one VHS copy of Cameras 1 and 4 and one VHS copy of Camera 3. (Pls' Ex. E.) None of the VHS copies start at the same time[22] nor do they end at the same time[23]. (Id.) Martin testified that within two weeks of the incident the videos from October 12, 2006 were sent to Aaron Rents home office. (Martin Dep. P. 123, L. 11-21.) VHS copies of Camera's 1, 3, and 4 were manually filed with the Court on September 28, 2009. (Pls' Ex. F & G.)

This leaves the discrepancy and dispute over Camera 2 and the incorrect timing. Moore states that "[Camera's 1 and 2 are] mounted next to each other behind the counter. . . one shines towards the right, one shines towards the left." (Moore Dep. P. 61, L. 21-24.) Adams states "[b]ut I believe [Camera 1 and 2] showed the same image. Therefore, they were recording the same sales floor. Either that, or Camera 2 was blank. I don't recall which occurred, but there was an error with the cameras." (Adams Dep. P. 303, L. 1-5.) Detective Matevey stated "there are two cameras that are in the showroom area of the store and both of the cameras were pointing towards the front of the store and covered *nearly* the same area." (Def. Ex. 1 to Ex. E.)(emphasis added). There are four screens from the security cameras that the general manager is able to watch. (Martin Dep. P. 126, L. 7-11.) The security camera and inventory scanner's time stamps were inaccurate. (Adams Dep. P. 313, L. 18-23.)

After at least three unsuccessful requests for Defendants to produce all four video cameras, Plaintiff and Plaintiff-Intervenor jointly filed this motion to compel production of all electronic security cameras. Particularly, Plaintiff and Plaintiff-Intervenor are seeking Camera 2. Defendants responded that Plaintiffs' motion did not include the required certification, the

---

miscalculated the timing errors of the tapes, but are the only complete timeline which has been provided. (Adams Dep. P. 319, L. 3-5.)

[22] Camera 1 starts at 7:30 AM. Camera 4 starts at 8:44 AM. Camera 3 starts at 7:45 AM.

[23] Camera 1 ends at 10:20 AM. Camera 4 ends at 9:12 AM. Camera 3 ends at 9:55 AM.

production requests are vague and ambiguous, and all security camera footage that exists has

been produced.

## **ANALYSIS**

1.Defendant's Argue Plaintiffs Did Not Include The Required Rule 37 Certification

> Rule 37(a)(1) reads:
> The motion must include a certification that the movant has in good faith
> conferred or attempted to confer with the person or party failing to make
> disclosure or discovery in an effort to obtain it without court action.

FED. R. CIV. P. 37(a)(1). Plaintiff's allegation in their pleadings under paragraph 8 states

"[t]he parties made a good faith effort to resolve their differences." This recitation comes

after Plaintiffs' alleged they have attempted numerous times to reach an agreement as to

the production of the electronic images of the security cameras. These statements are

sufficient to satisfy Rule 37's certification requirement.

2. Defendant's Response That Plaintiffs Second Requests for Production No. 8 and No.
49 Were Vague And Ambiguous.

Plaintiffs' Second Requests for Production No. 8 requests: "[t]hose documents,

audio recording or video recording related to the allegations in Plaintiff's Complaint."

Defendants responded the request was "vague and ambiguous," and the request was

privileged. The privilege argument falls quickly because Defendants' produced a

privilege log two months after this objection. Their privilege log does not contain any

reference to the video or audio recordings. Plaintiff's complaint alleges conduct by

Moore occurring between November, 2005 and October 12, 2006.  The only portion of

Plaintiff's Request No. 8 that is conceivably vague or ambiguous is "those documents."

That part shall be stricken and replaced with more narrow terms. Specifically, the video

or audio recording relating to the allegations in Plaintiff's complaint would be all

occasions where Alford and Moore worked together between November, 2005 and October 12, 2006.

Plaintiff's Second Requests for Production No. 49 requests: "[t]he security tapes reviewed by Brad Martin, as referenced in the statements of Brad Martin during his interview with the EEOC." Defendant's objected on the ground that "[Request No. 49] is vague and ambiguous."  Defendants further object that Request No. 49 is "irrelevant and immaterial to the issues or subject matter of this action." Defendant's arguments here are, simply put, disingenuous. Martin produced twenty-eight statements to the EEOC spanning twenty-seven pages. (Martin Resp. to EEOC) Only one of the EEOC questions (Question 13) presented to Martin related to the security tapes. (Id.)

Question 13:   Where would I find the security tapes that you reviewed [with respect to Ms. Alford's allegation of sexual assault, if you know?

Answer to 13: They would have been sent to home office.

 (Id.)

There is nothing ambiguous or vague about what Plaintiffs' meant with "as referenced in the statements of Brad Martin during his interview with the EEOC." Nor is that material irrelevant or immaterial. Plaintiffs' allegations involve sexual assault. They are requesting a video tape that was watched by one of the Defendants with respect to the allegation of sexual assault. This is clearly relevant and material to the issues.

3. Defendant's Response That All Security Camera Footage That Exists Has Been Produced.

The questions here are: (1) what happened to Camera 2's footage; and (2) why does it no longer exist.  There is no consistent determination of whether Camera 2 recorded anything or not.  There is no consistent determination if Camera 2 did record if

it recorded a 100% identical image as Camera 1. The only consistent determination is that Camera 1 and Camera 2 both recorded areas of the sales/showroom floor. Martin was told by Adams to preserve everything and not to let anything leave the store. As a result, Camera 2's footage should be preserved somewhere. Camera 2's footage—stored internally in the Camera itself—from which a copy should have been made when Hicks and Martin were making the copies for Aaron Rents' home office.

Martin admits he was explicitly instructed to preserve everything. The fact that Camera 2 may have been blank or produced the same or nearly the same image as Camera 1 does not change the fact that he was supposed to preserve everything. Defendants' defense that they cannot produce what they do not have raises serious concerns over why they do not have that footage.

## <u>RECOMMENDATIONS</u>

1.      Plaintiffs' are deemed to meet the certification requirements of Rule 37.

2.      Plaintiffs' Motion to Compel for Request for Production No. 8 shall be granted to the extent of a modified version of the request reading: "Those documents relating to audio or video recordings, audio recordings, or video recordings related to the allegations in Plaintiff's Complaint that occurred between November, 2005 and October 12, 2006.

3.      If Defendants claim any of the content sought to be received under Request for Production No. 8 is subject to the attorney-client privilege, work product doctrine or other privilege, then they must submit that in their privilege log that shall be in compliance with the Special Master's

Document 130 recommendation for privilege log formatting and information.

4.     Plaintiffs' Motion to Compel for Request for Production No. 49 shall be fully granted. The video tapes Martin watched with respect to Alford's sexual assault allegation that can be found at Aaron Rents home office shall be produced to Plaintiffs.

5.     Defendants' defense that they do not have to produce what they do not have is contrary to Adams' instruction to preserve everything. This footage shall be required to be produced from the digital copy Camera 2 created. If it cannot be produced because it "does not exist," a competent representative of Aaron Rents will provide an affidavit with factual detail as to attempts to locate the missing digital recording and cameras.

6.     Plaintiffs' requests for costs and attorneys' fees for the taking of depositions and the filing of this motion should be granted.

I.      Ashley Alford's Motion to Compel Responses to Plaintiff-Intervenor's First Request for Production of Documents to Brad Martin **(Document 124)**

II.     Ashley Alford's Motion to Compel Responses to Plaintiff-Intervenor's Second Request for Production **(Document 125)**

III.    Ashley Alford's Motion to Compel Responses to Plaintff-Intervenor's Third Request for Production **(Document 126)**

IV.     Ashley Alford's Motion to Compel Responses to Plaintff-Intervenor's Fourth Request for Production **(Document 134)**

V.      Ashley Alford's Motion to Compel Responses to Plaintff-Intervenor's Fifth Request for Production **(Document 135)**

## <u>BACKGROUND</u>

Plaintiff-Intervenor seeks to compel responses to one hundred-seventeen (117) requests for production directed to Brad Martin, in the first request, and Aaron Rents for the remaining four requests.  Consistent with their ways, the parties found a means to convert five motions into, cumulatively, six hundred sixty-one (661) pages.  Beyond the document production, Plaintiff-Intervenor seeks a proper privilege log under Rule 26.  Through some measure of cooperation by the parties, and with help from the Court, portions of the disputes have been resolved.  All of the pleadings were filed after the Court's In-Person Discovery Conference.  Unfortunately, no party managed to use the six hundred sixty-one (661) pages to definitively provide the Court with what

exactly remained to be produced, what objections were outstanding, and what methodology they propose to address the issue.  Rather, they seemed content to foist the burden of deconstructing the quagmire on the Court.

More concerning is the document dump.  Ms. Shelly addressed the issue stating that, "what I would characterize as having happened here is that through all the requests for production what we have received . . . is something close to what has been called a document dump."  (Doc. 117, P. 132 L. 1-5.)  "What I have is literally stacks of documents."  (Id. at P. 141, L. 24-25.)  Ms. Shelly explained, "[w]hat I did is spend an enormous amount of time going through the records that the Court ordered them to turn over."  (Id. at P. 141, L. 25; P. 142, L. 1-2.)  The Court inquired:  "[y]ou are telling me you asked them this stuff.  They didn't direct you to where, they just gave you a bunch of documents."  (Id. at 142, L. 11-14.)  "Correct," said Shelly.  (Id.)  Ms. Shelly "found this one here, a hundred pages later or 500 pages later I found another one here."  (Id. at P. 143, L. 20-25; P. 143, L. 1.)

Ms. Cleek offered a letter to Ms. Cates to prove that no document "dump" occurred.  Judge Wilkerson read the letter out loud, with commentary on the Defendants' Counsel's tone:

And this is not the full last paragraph but – three sentences in.  It says, "It is my understanding that you believe we may have jumbled up the order of the pages in the personnel files prior to producing them.  As I have mentioned previously these types of disparaging comments and accusations without any support" – see that's the nonsense kind of stuff – "for same are counterproductive and do not assist the parties" – I don't know why you brought that kind of stuff to my attention – "as Mr. Escoffery informed you --"

42

See this is stuff that means nothing so far.  I didn't do it.  Yes, you did.  I didn't do it.

Yes, you did.  Give me a break, man.

-- "we did not change the order of pages in the personnel file but produced all the

personnel files.  They were kept in the regular course of business.  We would like to

know where one personnel file start" – that's nothing.  That's not an index.  That's

nothing.

Ms. Cleek, response to the Court's inquiry, stated, "I'm not saying I don't have an index .

. . I know what I've produced.  I have an index.  I've *offered* it to them."  (Doc. 117, P. 146, L.

22-25; P. 147, L. 1-4. (emphasis added).)  The index was surrendered to Plaintiff and Plaintiff-

Intervenor's counsel within days of the conference.

Defendants' Counsel prefaces every document request response with broadly phrased

"standing objections." (Doc. 124-2.) Moreover, their specific objections and responses leave

little to be desired, by example:

<u>REQUEST FOR PRODUCTION NO. 16</u>:

> Each and every document that demonstrates any "attendance issues" for Ashely Alford,
> as referenced in the statements of Brad Martin during his interview(s) with the EEOC.

<u>RESPONSE TO REQUEST NO. 16</u>:

> Aarons objects to Request No. 16 on the grounds that it is vague and ambiguous with
> regard to the use of the terms "attendance issues" and "statements of Brad Martin during
> his interview(s) with the EEOC."  Specifically, Aarons is unaware without further
> information as to which "statements" Plaintiff-Intervenor is referring.  Aarons further
> objects to said Request on the grounds that is it overly broad, unduly burdensome or is
> calculated or would otherwise operate to annoy, embarrass, oppress or cause undue
> expense to Aarons or to any individual not a party to this action.  Aarons also objects on
> the grounds that it would require Aarons to respond by acquiring or supplying documents
> which are irrelevant and immaterial to the issues or subject matter of this action, and
> which are not reasonably calculated to lead to the discovery of admissible evidence.
> Subject to and without waiving the foregoing objections, Aarons responds that it will
> produce documents showing Plaintiff-Intervenor's attendance at a mutually agreeable
> time and place at Plaintiff-Intervenor's expense.

## ANALYSIS

Rule 34, Fed. R. Civ. P. governs requests for production of documents.  Objections based upon a request being overly broad, unduly vague and/or ambiguous, in general, "are probably not justification for refusing to provide document altogether, but the responding party can raise the objection, then expressly limit the scope of the response."  STEVEN BAICKER-MCKEE, WILLIAM M. JANSSEN, AND JOHN B. CORR, FEDERAL CIVIL RULES HANDBOOK 2010  846-47 (2009).  Rule 26 takes a very broad approach with respect to what information is discoverable.  Rule 26(b)(1), Fed. R. Civ. P. Broad sanctions power, designed to expedite litigation and resolve discovery disputes, is available.  See Rule 37(b)(A), Fed. R. Civ. P.  Court's have found a party's acts did not meet Rule 34 standard when "the documents were not accompanied by any indices or other tool to guide . . . [the opposing party] to the responsive documents."  Graske v. Auto Owners Ins. Co., 647 F. Supp. 2d 1105, 1108 (D. Ne. 2009).  A blanket "dump" of documents is "deficient." Id. at 1108.  The responding party "is certainly more familiar with its own business records than . . . [the requesting party].  Id.  Absent sufficient guidance in locating documents, "the burden to find the responsive documents is not substantially the same on both parties."  Id.

Both parties have placed an inappropriate burden on the Court.  The attorney's role is to help the Court to understand the issues.  Their resources, not the Courts, should be used to establish what remains to be decided.

Defendants' document production, more aptly document "dump," is inexcusable. Moreover, the "ploy" of offering an index, but not just sending it is ludicrous and engenders suspicion and hostility.  Defendant's counsel must atone and make every effort to reduce the burden on Plaintiffs' counsel.  They will have one chance.  The responding party has two options:  "produce them as they are kept in the usual course of business" or organize and label

them to correspond with the request.  <u>Am. Int'l Specialty Lines Ins. Co. v. N.W.I. – I, Inc</u>., 240

F.R.D. 401, 410 (N.D. Ill. 2007).

Finally, Defendant's practice of interposing a variety of objections and producing, seemingly,

carefully selected documents while secreting some, impedes the discovery process. If you have

produced all the documents responsive to a request then just state that fact.

## <u>RECOMMENDATIONS</u>

1.   The parties shall, within fifteen days of this recommendation being adopted, meet
     and confer to create a listing of what document requests are extant.

2.    They will undertake serious efforts between themselves to resolve the
     outstanding issues.

3.   Defendant's shall specifically identify any document not produced premised upon
     its "specific request objections", excepting those based upon a privilege that has
     been included in the privileged log.

4.   The Court shall set a time to review and hear arguments on Defendant's
     objections.  However, all the requested documents to each request, with the
     exception of privileged documents, shall be present at that review, even those not
     produced due to objections.

I.     Plaintiffs' Motion to Require Defendant Aaron Rents, Inc. to Produce Documents in
       Compliance with Rule 34 of the Federal Rules of Civil Procedure.
       (**Document 132**)

## BACKGROUND

Plaintiffs' have made six separate Requests for Production of Documents totaling 143 individual production requests. The total number of documents provided to Plaintiffs is disputed.[24] Plaintiffs' allege that the documents were provided in "identical boxes without any index or indication as to what the documents are, where the documents were maintained, who maintained them, and whether its documents came from one single source or file or from multiple sources or files." (Doc. 132.) Defendants' retort is that Plaintiff's production is equally flawed vis-a-vis Rule 34 compliance. (Def. Mem. In Opp'n to Pls.' Mot. To Require Def to Produc. Docs. P. 7-8.) "[Defendants] can't just dump thousands of documents on [Plaintiffs] without telling them something." (Disc. Dispute Conference, September 15, 2009, Judge Wilkerson P. 143, L. 15-16.)   Plaintiffs' state "Defendant produced a copy of an index for the documents it has produced. The index does not identify to which specific request for production responsive documents have been produced, nor does the index indicate that the copies have been produced in the regular course of business."[25] (Pls.' Mot. To Require Def. to Produc.  Docs. ¶6.)

Defendant's index indicates Bates stamped documents #'s 7986-7988; 8203-8303; 8425-8426 correspond with the BellSouth 1-800 Hotline Invoice for April 7, 2006[26]. (Pls.' Ex. 7.) Bates stamped document #7986 is pages 25 and 26 of the 26 page Bellsouth invoice for April 7, 2006. (Pls.' Ex. 3.) Bates stamped documents #7987 and #7988 are pages 23, 24, 25, and 26 of a

---

[24] Plaintiffs' Motion alleges approximately 8,500 pages have been produced by Defendants. Plaintiffs' Memorandum in Support of the Motion alleges approximately 6,500 pages have been produced by Defendants.
[25] Defendants Index indicates which general request number the documents are being provided, but not the specifically requested document. (Pls.' Ex. 7.)
[26] The Bates stamped document #'s 7986-7988 are listed for the April 7, 2006 invoice which comes directly after the Bates documents #'s 7747-7984 for May, 2006 Hotline Call Documentation.

26 page Bellsouth invoice for May 7, 2006. (Id.) Additionally, inside Defendant's index the

document 1-800 Hotline invoices listed with no reference to dates for Bates documents #'s 6800-

6813. Another instance of non-sequential organization is seen between Bates documents #'s

7747-7893. The dates of the "Hotline Call Documentation (May)" as corresponded to their Bates

number is:

- 03/02/06: 7751, 7864-7893;
- 3/29/06: 7749-7750;
- 05/01/06: 7837, 7843-7851, 7859-7863;
- 05/03/06: 7838-7842;
- 05/04/06: 7836;
- 05/05/06: 7747, 7754-7757, & 7781-7786,
- 05/12/06: 7828-7831;
- 05/15/06: 7832, 7833;
- 05/16/06: 7787-7791, 7834, & 7835;
- 05/17/06: 7824-7827;
- 05/18/06: 7765-7770,
- 05/19/06: 7762-7764, & 7792-7795;
- 05/22/06: 7748, 7758-7761, &7817-7823;
- 05/23/06: 7777-7780, 7796-7801, & 7814-7816;
- 05/24/06: 7752 &7802-7813;
- 05/26/06: 7771-7776;
- 05/31/06: 7753.

(Pls.' Ex. 7.)

Defendants contend they have complied with Rule 34. Defendants allege they have

supplied the documents as "they were 'kept in the ordinary course of business.'" (Def's Mem. In

Opp'n to Pls.' Mot. To Require Def. to Produc. Docs. In Compliance With Rule 34.) Defendants

contend that Plaintiff's accusations lack any specific citations showing "Aarons' alleged failure

to comply with Rule 34." (Id.) Defendants concluded "it is not the number of pages produced

that is startling, but rather the number of discovery requests that Plaintiffs have propounded."

(Id.)

## ANALYSIS

Rule 34's relevant section provides:

> (E) Producing the Documents or Electronically Stored Information. Unless otherwise stipulated or ordered by the court, these procedures apply to producing documents or electronically stored information:
>> (i) A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request.

FED. R. CIV. P. 34(b)(2)(E)(i). "Rule 34 was amended in 1980 because of a concern that litigants were deliberately mixing critical documents with masses of other documents to hide their existence or obscure their significance." In re Sulfuric Acid Antitrust Litig., 231 F.R.D. 351, 363 (N.D. Ill. 2005). "[P]laintiffs can legitimately fear defendants' unwillingness to segregate the documents masks a hope to obscure." Bd. of Educ. of Evanston Twp. v. Admiral Heating & Ventilating, Inc., 104 F.R.D. 23, 36 (N.D. Ill. 1984). "A party responding to a document request under Rule 34 has a choice of producing the documents 'as they are kept in the usual course of business' or of 'organiz[ing] and label[ing] them to correspond with the categories in the request.'" Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp., 222 F.R.D. 594, 598 (E.D. Wis. 2004) (quoting FED. R. CIV. P. 34(b)).

Thus, since no court order or stipulation has occurred, Defendants are free to produce the documents in either the "usual course of business" or "organize and label them to correspond to the categories in the request." FED. R. CIV. P. 34(b)(2)(E). Defendants "elected to produce documents as they were 'kept in the usual course of business.'" (Def. Mem. In Opp'n to Pls.' Mo. to Require Def. to Produc. Docs. In Compliance With Rule 34.) "Courts view documents produced from storage facilities with caution because 'once documents not used with regularity are sent to a storage facility, . . . then it is no longer essential that they be kept with any degree of organization." Breunlin v. Vill. of Oak Park, No. 07C4627, 2008 WL 2787473, at *4 (N.D. Ill.

July 17, 2008) (quoting <u>In re Sulfuric Acid</u>, 231 F.R.D. at 363). Here, it is unclear from the facts whether Defendants documents came from storage facilities.[27] "As to the documents in storage, they are no longer kept in the 'usual course' of *business*,' they are kept in the usual course of '*storage,*' and the option granted by the first clause of Rule 34(b) no longer exists. That leaves the producing party with the obligation to 'organize and label' the documents to correspond to the document requests." <u>In re Sulfuric Acid</u>, 231 F.R.D. at 363 (citing <u>City of Wichita, Kan. v. Aero Holdings, Inc.</u>, No. 98-1360-MLB, 2000 WL 1480499 at *1 (D. Kan. May 23, 2000)) (emphasis in original).

Defendant's argument that they have produced the documents in a similar form as Plaintiffs bares the same tit-for-tat argument that both sides have continuously used. This position, as before, remains irrelevant to the determination of Plaintiffs' motion.

## <u>RECOMMENDATIONS</u>

1.     The recommendation is contingent upon whether Defendants documents were produced from a storage facility or at their business:

   A.     If Defendant's documents were produced from a storage facility then Defendants have a duty to organize and label them.

   B.     If Defendant's documents were produced from its business then Defendants have sufficiently complied with Rule 34.

---

[27] Since the dates of Defendants' documents range from 2002 through 2008, there exists a strong possibility that the older documents produced came from storage facilities.

I.      Plaintiff EEOC and Plaintiff-Intervenor Ashley Alford's Joint Motion to Allow Plaintiffs
        to Contact Harassment Hotline Callers
        (**Document 127**)

## BACKGROUND

Aaron Rents has a Non-Discrimination and Sexual Harassment Policy (the "Policy").

(Doc. 150, P. 2.)  The Policy outlines Aaron Rents commitment to preventing discrimination and

harassment in the workplace, and includes a toll-free number to a hotline that any Aaron Rents

employee can call if they feel they have been discriminated against or sexually harassed (the

"Hotline").  (Id. at 2-3.)  Alford testified that she called the Hotline in April 2006 and left a

message that stated, "My name is Ashley Alford and I need help."[28]  (Alford Dep. P. 264.)

Alford's call lasted 24 seconds.  (Doc. 127, P.2 (citing Ex. 3).)  Chad Strickland, an

Aaron Rents employee who helps manage the Hotline, testified that the current message prompt

lasts approximately 32 seconds.  (Strickland Dep. P. 37.)  Although the message prompt from

2006 is no longer available, Strickland testified that the only difference between the current

prompt and the 2006 prompt is that the current prompt asks the caller to spell their name.  (Id. at

26.)  Given this evidence, the parties dispute whether Alford actually left a message on the

Hotline.

Alford alleges claims of assault, battery, intentional infliction of emotional distress,

retaliation, and various negligence claims against Aaron Rents.  (Doc. 15, P. 2)  Aaron Rents has

asserted numerous affirmative defenses to Plaintiffs' claims.  The defenses relevant to this

motion are the *Faragher/Ellerth* defense, and the *Kolstad* "Good Faith" defense.  The

*Faragher/Ellerth* defense requires an employer to show: (1) that it "exercised reasonable care to

prevent and correct promptly any sexually harassing behavior," and (2) the employee

---

[28]Alford also testified that she called the hotline a few months later but hung up before someone answered.  *Id.* at 4.

"unreasonably failed to take advantage of any preventive opportunities provided by the employee or to avoid harm otherwise." Burlington Indus. v. Ellerth, 524 U.S. 742, 765 (1998).  The Good Faith defense applies to punitive damages, and states that "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII." Kolstad v. Am. Dental Assoc., 527 U.S. 526, 545 (1999) (internal quotations omitted).

Plaintiff is seeking permission to contact individuals who previously called the Hotline. Plaintiffs claim that in order to argue against the *Faragher/Ellerth* defense, they must be able to speak with callers about their experiences using the Hotline.  Specifically, Plaintiff seeks to inquire whether use of the Hotline resulted in the correction of sexually harassing behavior—the first prong—and whether individuals with calls lasting 24 seconds were able to leave a message on the Hotline, which could bolster Plaintiffs' factual claim that Alford did indeed properly utilize the Hotline—the second prong.  Plaintiffs also claim that in order to defeat Defendant's Good Faith claim against punitive damages, they must be able to show that Aaron Rents' sexual harassment policy was not enforced.  Plaintiffs argue that this can be shown by asking individuals who used the Hotline whether Aaron Rents did, in fact, enforce its policy. For the reasons stated below, Plaintiffs' request should be denied.

## **ANALYSIS**

It is well-established that "[d]istrict courts have broad discretion in matters relating to discovery." Patterson v. Avery Dennison Corp., 281 F.3d 676, 681 (7th Cir. 2002).  The court may prohibit discovery if it is obtainable through another source that is less burdensome or expensive.  Id.  Before a court limits discovery, it must consider all relevant circumstances, "weighing the value of the material sought against the burden of providing it…"  Id.  Courts

must be particularly weary of lawyers "who attempt to bury opposing counsel in paperwork by requesting material that they don't really want and don't really need." Rowlin v. Alabama Dept. of Pub. Safety, 200 F.R.D. 459, 461 (M.D. Ala. 2001) (cited with favor by Patterson v. Avery, supra).[29]  In short, if a court finds a discovery request unduly burdensome, it may decline to grant it.

Faragher/Ellerth's First Prong

Plaintiffs argue that they should be able to contact individuals who used the Hotline in the past because they may uncover evidence that proves Aaron Rents did not exercise reasonable care to prevent and correct promptly any sexually harassing behavior.  However, this line of reasoning misconstrues the first prong of the test. The Faragher/Ellerth standard requires an examination of the conduct at issue in a specific case, and not to an employer's past conduct in similar situations.  In other words, the question the court must answer under the Faragher/Ellerth affirmative defense is not whether Aaron Rents past efforts to prevent and correct any sexually harassing behavior were effective, but rather, whether Aaron Rents' effort in this particular instance involving Alford was ineffective to remedy the harassment.  Therefore, past investigations involving individuals not connected with this lawsuit are irrelevant, and Plaintiff's effort to contact such individuals would serve no purpose.  Because any evidence uncovered would provide no probative value, the court need not discuss the burden involved in obtaining it.

Faragher/Ellerth's Second Prong

Whether Alford took advantage of resources in place to report her harassment largely depends on whether she actually left a message on the Hotline.  Although she testified that she did, Aaron Rents claims that she did not.  In support, Aaron Rents cites the fact that her call

---

[29]The court noted that this is "particularly true in the employment law context, where it is universally known that a vindictive employee, an aggressive lawyer and a couple stray comments are all that one needs to embroil any employer in protracted, expensive litigation." Id.

lasted 24 seconds, and that Strickland testified that the current prompt, which does not vary significantly from the 2006 prompt, lasts 32 seconds.  Plaintiff's claim that by contacting other individuals whose calls lasted a similar duration, they will be able to prove that Alford did leave a message on the Hotline, and thus, utilized the resources in place to report her harassment.

The probative value of finding out whether certain callers were able to successfully leave messages on the Hotline is minimal.  Even if Plaintiffs found callers with identical 24-second calls who were able to leave a message, this information may not help Plaintiffs defend against the second prong of the affirmative defense, and the inquiry would not end there.  For example, if it is later found these callers received a response from Aaron Rents, then their testimony would bolster Aaron Rents' claim that Alford never left a message—on the theory that if she did leave a message, someone from Aaron Rents would have called her back, which did not happen. Conversely, if these callers did not receive a response from Aaron Rents, then their testimony is just as questionable as Alford's.  Plaintiffs also fail to specifically explain how they intend to gather this information.  They have offered no logistical plan regarding whom they intend to call, under what terms, and at what point their inquiries will cease.  They merely state that they "need to be allowed to contact individuals whose phone calls appeared to last less than a minute to find out what actually occurred when they called the 1-800-number." (Doc. 127, P. 3.)  The majority of the phone calls to the Hotline last under a minute, and the Special Master fails to see how probative evidence will be discovered under Plaintiffs' vague and overbroad request.

Although quite limited, this discovery could have some probative value in the context of the second prong.  Therefore, the Special Master will address the costs associated with the discovery if it were granted.  It is the Special Master's finding that the costs associated with such discovery far outweigh its value for the reasons discussed below.

Allowing Plaintiffs to call these individuals would violate the expectation of privacy they enjoyed when they called the Hotline.  Although Plaintiffs argue that callers do not have an expectation of privacy, this assertion defies both common sense and the evidence on record. Aaron Rents Policy firmly states, "Be assured that your call will be treated in the strictest confidence possible and you will incur no reprisal for reporting good faith claims."  (Doc. 150, P. 3 (citing Ex.6).)  Furthermore, Strickland testified that Aaron Rents informs every caller that they will "try to keep the call as confidential as possible..." (Strickland Dep. P. 245.)  This confidentiality is also mandated by the EEOC's own guidelines.  In its "Enforcement Guidance" document, the EEOC mandates that an anti-harassment policy should contain "assurance that the employer will protect the confidentiality of harassment complaints to the extent possible." http://eeoc.gov/policy/docs/harassment.html.  Violating this expectation of privacy would result in a chilling effect on future callers' willingness to utilize the Hotline, which would weaken Aaron Rents ability to combat discrimination and harassment.   Additionally, if Plaintiffs were allowed to contact Hotline callers, a situation could arise where they reach out to a woman who was a victim of harassment and called the Hotline to report it, but changed her mind before leaving a message.  If Plaintiffs end up calling this woman, there is a possibility that the woman's husband, child, parent, or anyone else who shares the same phone line will now be aware of the harassment that the caller chose to keep to herself.  Although this is just one possibility, the potential for problems resulting from Plaintiffs contacting past callers is too significant to ignore.

Allowing Plaintiffs to call the individuals would also result in future, voluminous discovery that would be unduly burdensome.  If Plaintiffs found individuals whose calls lasted roughly 24 seconds and were able to leave messages on the Hotline, those individuals would

have to be subpoenaed and deposed.  Confidentiality problems aside, this would result in greater amounts of discovery, as Aaron Rents would then try to contact individuals and find callers with similar durations who were not able to leave messages on the Hotline.  Given the large amount of discovery that has already taken place in this case, the Special Master does not believe that the additional, lengthy, unhelpful discovery is warranted.

<u>Good Faith Defense</u>

Similar to the first prong of the *Faragher/Ellerth* standard, Plaintiffs seek to use past Hotline callers' negative experiences to show that Aaron Rents failed to adequately enforce its discrimination and harassment policy.  Unlike *Faragher/Ellerth*, however, an employer's conduct with regards to past investigations is relevant to prove this affirmative defense.  <u>See</u> e.g., <u>Kolstad</u>, 527 U.S. at 545-46 (holding that "employers who make good-faith efforts to prevent discrimination in the workplace" should be protected from punitive damages liability).

Although this information may be relevant, Plaintiffs' proposed method of calling various individuals to gather the information is not the least burdensome way of procuring such information.  Strickland and Vanessa Adams, two Aaron Rents employees whose responsibilities included managing the Hotline, were deposed and are available to testify at trial.  Furthermore, Aaron Rents has already produced detailed records about past Hotline callers, its investigation into their claims, and the dispositions of each claim.  (<u>See</u> Plaintiff's Dep. Ex. 5.)  Plaintiffs will have the opportunity to examine these records and cross-examine Adams and Strickland about the various procedures in place at Aaron Rents.

Additionally, the privacy concerns outlined in the previous section apply to this analysis as well.  The Special Master is satisfied that Plaintiffs already have adequate resources by which to measure Aaron Rents good faith efforts to enforce its discrimination policy, and a detailed

inquiry into each past individual harassment claim is not necessary. Plaintiffs' request to contact individuals who called the Hotline is burdensome, unnecessary, and would likely not result in the discovery of evidence.  For these reasons, their motion should be denied.

## **<u>RECOMMENDATION</u>**

1.      This Court is recommended to deny Plaintiffs' Joint Motion to Allow Plaintiffs to Contact Harassment Hotline Callers.

I.    Plaintiff-Intervenor's Motion To Strike Declarations of Counsel for Defendants (**Documents #142 & 158**)

II.   Plaintiff-Intervenor's Motion To Strike Declarations of Vanessa Adams (**Document 156**)

## BACKGROUND

Ms. Adams and Defendant's attorneys Ms. Cleek, Mr. Friedman, and Mr. Escoffery filed declarations with this Court pursuant to 28 U.S.C. Section 1746. These declarations were used for support of previously filed documents by Defendants. Each declaration in some way raises a conflict with another statement made previously by either another Defendant or by Plaintiffs. In Mr. Escoffery's declaration, he declares "Plaintiff-Intervenor's counsel contends that I made speaking and coaching objection[s] during Mr. Strickland's 30(b)(6) deposition. That was not the case. To the extent I raised objections during the deposition, I did so for *appropriate reasons* and in an *appropriate manner.*" (Doc. 140-1, P. 2 (emphasis added).) Mr. Friedman declared he did not "display any malicious intent." (Doc. 140-2, P. 3.) Ms. Cleek declares she has "a good faith belief based on law in this Circuit that the EEOC has waived any deliberative process privilege." (Doc. 140-3, P. 6.) Ms. Adams makes declarations that are inconsistent with her testimony at her depositions. At her deposition, she testified she "vaguely remember[ed] possibly seeing the box" of documents from Moore's desk that Martin had sent to her. (Adams Dep., P. 190.) In her sworn declaration, she declares "there is no 'box' of documents that Mr. Martin packed from the contents of Richard Moore's desk." (Doc. 157-2, P. 3.)

Plaintiff-Intervenor's Counsel filed motions to strike Declarations of Counsel for Defendants and the Vanessa Adams. (Docs. 142, 156, and 158.) Plaintiff-Intervenor's Counsel contends the declarations were arguments used to extend upon their briefs and replies in order to circumvent the Court's page limits on briefs. (Doc. 142, P. 2.) Defendants contend a motion to

strike is only available to pleadings and declarations are not pleadings. (Doc. 161, P. 3.)

Defendants also contend all the declarations were submitted for proper purposes. (Doc. 161, P.

4.)

## ANALYSIS

28 U.S.C. Section 1746 states:

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

> (1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)".
> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

28 U.S.C. § 1746 (2009).

Local rules make it clear that:

1. "No brief shall be submitted which is longer than 20 double-spaced typewritten pages in 12 point font." ILSD-LR 7.1(d);
2. "Reply brief shall not exceed 5 pages." ILSD-LR 7.1(d);
3. "Requests for additional pages are not allowed." ILSD-LR 7.1(d); &
4. "**Reply briefs are not favored and should be filed only in exceptional circumstance.**" SDIL-LR 7.1(c)(emphasis in original).

Defendants filed a reply with the Court in support of Defendant's Motion for an Order

Admonishing Plaintiff-Intervenor's Counsel to Allow all Deponents to Complete their Answers

Without Interruption, and Against Taking Photographs in Connection with a Judicial Proceeding.

(Doc. 140.) The reply (not including the certificate of service) comprises five pages—the local rule maximum.

However, Defendants managed to slip in an extra twenty-three pages of declarations by Defendant's counsel. Throughout these declarations, Defendant's Counsel contends with Plaintiffs' characterizations of their actions. Any contention should have been made in the reply seeing as how Defendants found this situation to be an exceptional circumstance. Additionally, Adams' declarations are inconsistent with her previous statements. Defendants correctly point out "declarations are not pleadings, therefore, they are not subject to motions to strike." (Doc. 161 P. 3.) Based on the Local Rules, Defendants should have been aware that requests for additional pages are not allowed. Defendants used 28 U.S.C. Section 1746 in an attempt to supply this Court with additional arguments that Plaintiffs' were not entitled to. This attempt to circumvent the Court's rules is, simply put, unacceptable. The Declarations by Counsel and Adams should be stricken.

## **RECOMMENDATION**

1.      All declarations made by Defendants' Counsel and Adams are inconsistent with the Local Rules. The declaration should be stricken under this Court's inherent powers or Rule 37.


Respectfully submitted,


   __/s/ Bill B. Dorothy II_____

Bill B. Dorothy, II
Special Master